MGD

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert S. Reed, | No. CV 17-01602-PHX-DGC (JFM) |
| Plaintiff, | |
| v. | **ORDER** |
| Itoro Elijah, et al., | |
| Defendants. | |

Plaintiff Robert S. Reed, who is currently confined in the Arizona State Prison Complex-Lewis, brought this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 14.) Defendant Elijah moves for summary judgment, and Plaintiff opposes.[1] (Docs. 41, 44.) Defendant Elijah has also filed a "Motion to Strike Sur-Reply and Supporting Documents (Docs. 50 and 51)." (Doc. 53.) The Court will deny both Motions.

**I.      Background**

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an Eighth Amendment medical care claim against Defendant Dr. Itoro Elijah for discontinuing Plaintiff's pain medication and required her to answer. (Docs. 15, 16, 17.)

**II.     Motion to Strike Sur-Reply**

On September 4, 2018, Defendant filed her Motion for Summary Judgment and Separate Statement of Facts. (Docs. 40, 41.) On September 19, 2018, Plaintiff filed his

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response. (Doc. 43.)

1  Response and his Opposition to Defendant's Statement of Facts. (Docs. 44, 45.) On October 3, 2018, Defendant filed her Reply and a Supplemental Statement of Facts. (Docs. 47-48.) Defendant did not seek leave to file her Supplemental Statement of Facts, even though the Local Rules of Civil Procedure do not permit a reply statement of facts. *See* LRCiv 56.1(b). Plaintiff then filed a "Response to Defendant's Suppl[e]mental Motion for Summary Judg[]ment/Defendant's Reply Brief" and an "Opposition to Defendant's Suppl[e]mental Statement of Facts." (Docs. 50, 51.) Defendant now seeks to strike Plaintiff's Response and Opposition as an unauthorized sur-reply. (Doc. 53.) Plaintiff did not respond to the Motion.

One of the issues in this case is whether Plaintiff received his pain medication, Gabapentin, in the days prior to a July 13, 2016 blood draw to check for Plaintiff's Gabapentin levels. With her Motion, Defendant presented a medication administration record which indicates Plaintiff received one of his two daily doses of Gabapentin on July 11, 2016, and did not receive any doses on July 12 or 13, 2016. (Doc. 42 at 6-7.) In his Response, Plaintiff also presents evidence that he did not receive any Gabapentin in the two days prior to his blood draw. (Doc. 45 at 40 ¶ 5.) With her Reply, Defendant submits that same record indicating that Plaintiff did not receive any Gabapentin on July 12 or 13 and only one dose on July 11, 2016. (Doc. 48 at 5-6.) But she also produces a different type of medication administration form for July 2016, which was "Processed" on April 27, 2018, and this form indicates that Plaintiff received his Gabapentin twice daily on July 11, 12 and 13, 2016. (*Id*. at 9-10.) Defendant does not explain the discrepancy between these two records or why she did not produce the second record with her Motion, but she relies on the second record produced with her Reply to argue that Plaintiff did receive two doses of Gabapentin each day between July 11 and July 13, 2016. (Doc. 47 at 6-7.) Plaintiff contends that this second form showing he received two doses of Gabapentin each day from July 11-13 is "falsified" and his sur-reply disputes this new evidence. (*See* Docs. 50-51.)

1 Ordinarily, the Court would decline to consider Defendant's newly produced evidence submitted with her Reply. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (the district court should not consider new evidence presented in a reply to a motion for summary judgment unless the non-movant was given an opportunity to respond). Here, though, Plaintiff has responded to this newly produced evidence. Therefore, the Court may consider the evidence in Defendant's reply and Plaintiff's sur-reply. Accordingly, the Court will deny Defendant's Motion to Strike.

**III. Legal Standards**

    **A. Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## B. Eighth Amendment

Under the Eighth Amendment, a prisoner must demonstrate that a defendant acted with "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective prong and a subjective prong. First, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted). Examples of a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; to satisfy the knowledge component, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th

Cir. 2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. California Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

Finally, even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

**IV. Relevant Facts**

Plaintiff is 65 years old and suffers various ailments including diabetic neuropathy nerve pain, for which he has taken Gabapentin twice daily since 2009. (Doc. 45 (Pl.'s Opp'n to Def.'s Statement of Facts) at 1 ¶ 1; Doc. 45 at 39 (Pl. Decl.).) Plaintiff states that he has pain all day and night, that his nerve pain feels like pins and needles in his legs, feet, arms, and hands, and he has lower back pain and prostate pain during urination. (*Id*. at 40.)

According to Defendant, Plaintiff had a prescription for Gabapentin, 800 mg twice daily, which was ordered to be crushed in water and administered as "watch swallow." (Doc. 42 (Def.'s Statement of Facts) at 1 ¶ 1.) At times, rather than following orders to crush in water and watch swallow, medications were simply handed to the prisoners to take

themselves "if the pill line was long and the nursing staff was starting to get backed up." (*Id.* ¶ 2.)

On July 8, 2016, Nurse Practitioner Carrie Smalley ordered labs to test Gabapentin levels in Plaintiff's system; on July 13, 2016, Plaintiff had a "random" blood draw to determine his Gabapentin levels. (*Id.* at 1 ¶¶ 3-4.) On July 15, 2016, Defendant re-prescribed Plaintiff's Gabapentin. (*Id.* at 2 ¶ 5.) On July 19, 2016, Plaintiff's lab results were received and showed low levels of Gabapentin in his system, specifically, his blood level was noted as <1.0 and was flagged as "below lower panic [sic] levels." (*Id.* ¶ 6.) The medical record shows the "reference" range for Gabapentin to be 2.0-12.0. (*Id.* at 10.) On July 21, 2016, Defendant discontinued Plaintiff's Gabapentin prescription "due to undetectable levels of Gabapentin in his blood stream." (*Id.* at 2 ¶ 7.) Defendant states in her Declaration that Gabapentin levels at or above 2.0 are deemed therapeutic and that given the high dose of Gabapentin Plaintiff was prescribed and the fact that he had been on Gabapentin for a year and a half, Plaintiff's blood should have been "well within the normal range (>2)." (*Id.* at 64-65 ¶¶ 11, 15.) Because Plaintiff's blood levels were significantly below the therapeutic range, Defendant says "there was a very high suspicion [Plaintiff] was not taking the medication as prescribed" and so Defendant used her clinical judgment to discontinue Plaintiff's Gabapentin prescription.[2] (*Id.* at 65 ¶ 16.)

Plaintiff states that he was not given Gabapentin for 48 hours prior to the blood test and that "common sense dictates that if a human being is tested for Gabapentin or any other drug, and is not administered the pill in question, the dosage level would be lower than normal than if the person was administered the dosage." (Doc. 45 at 5 ¶ 3 and at 40 ¶ 5 (Pl. Decl.).) Plaintiff asserts that Defendant has failed to explain what the acceptable level would be when a person has not received the medication for 48 hours prior to a blood draw. (*Id.* at 6 ¶ 6.)

---

[2] Defendant does not explain how Plaintiff could not have been taking his medication as prescribed since it was supposed to be crushed into water and Plaintiff was to be observed as he swallowed it.

On July 29, 2016, Plaintiff filed a Health Needs Request (HNR) stating that he was experiencing pins and needles and burning in his hands, legs, feet, and arms. (Doc. 42 at 2 ¶ 8.) In response, Defendant saw Plaintiff on August 3, 2016 and "assessed and treated [him] for his complaint of neuropathy pain, amongst other things." (*Id*.) Plaintiff requested his Gabapentin back and Defendant told Plaintiff that his Gabapentin was discontinued "due to his lab results showing low levels of the drug in his system." (*Id*.) According to Defendant, Plaintiff "stated the Gabapentin was not really helping with the pain" and he asked for a Lyrica prescription, which he said had helped greatly in the past. (*Id*.) Defendant said she would think about prescribing Lyrica, "but there was no guarantee in light of the negative Gabapentin levels." (*Id*.) Plaintiff was taking Ibuprofen for neuropathy and back pain and Metformin for his Type 2 Diabetes and neuropathy.[3] (*Id*.)

Plaintiff denies ever telling Defendant that Gabapentin did not work for him and asserts that he repeatedly explained to Defendant that he needed the Gabapentin prescription renewed because it was the only medication that helped control his nerve pain, and he could not function with everyday living due to the pain he experienced. (Doc. 45 at 41 ¶ 8.) Plaintiff states that that he only requested Lyrica because Defendant would not prescribe Gabapentin. (*Id*. at 7 ¶ 8.) Plaintiff states that at the August 3, 2016 chronic care appointment, he told Defendant that he was experiencing extremely severe nerve pain that had gotten worse since his Gabapentin was discontinued, and he explained that he was not administered Gabapentin 48 hours prior to the blood test. (*Id*.) Nevertheless, Defendant refused to renew his Gabapentin prescription and denied his request for Lyrica. (*Id.* ¶ 7.) Plaintiff also disputes that Ibuprofen was appropriate for his diabetic neuropathy pain. (*Id*.)

On August 23, 2016, Defendant prescribed Capsaicin cream for Plaintiff's back and neuropathy pain.[4] (Doc. 42 at 2 ¶ 9.) Plaintiff states that Capsaicin cream has no effect on

---

[3] Metformin is used alone or with other medications to treat Type 2 Diabetes by controlling the amount of glucose in the blood and increasing the body's response to insulin. *See Metformin, U.S. Nat'l Library of Medicine, available at* https://medlineplus.gov/druginfo/meds/a696005.html (last visited June 20, 2019).

[4] Capsaicin cream has been used to reduce pain in people with nerve damage caused by diabetes. *See Capsicum, U.S. Nat'l Library of Medicine*, https://medlineplus.gov

neuropathy nerve pain. (Doc. 45 at 8-9 ¶ 9.) At a September 26, 2016 chronic care appointment with Defendant, Plaintiff again asked for Lyrica to replace the discontinued Gabapentin, and Defendant told Plaintiff that he would not be given Lyrica in light of his low levels of Gabapentin. (Doc. 42 at 2 ¶ 10.) After examining Plaintiff, Defendant prescribed Alpha Lipoic Acid for Plaintiff's neuropathy and ordered labs and diabetic shoes.[5] (*Id.*) Plaintiff states that he tried Alpha Lipoic Acid—which he believes is a holistic placebo—for two months, but it did nothing for his diabetic neuropathy nerve pain and caused him severe heart burn and abdominal cramps. (Doc. 45 at 40 ¶ 7.) When Plaintiff told Defendant this, she told him to "stay on it" as it takes a while to become effective. (*Id.*)

At a December 20, 2016 chronic care appointment, Plaintiff told Defendant that Alpha Lipoic Acid was not working for his chronic pain. (Doc. 42 at 3 ¶ 13.) Plaintiff was told to take his Ibuprofen and other prescribed medications for pain control and Plaintiff said he had not received his full Ibuprofen prescription. (*Id.*) After assessing Plaintiff, Defendant prescribed Nortriptyline for Plaintiff's nerve pain, Magnesium Oxide for muscle spasms, and agreed to discuss Ibuprofen delivery with the pharmacy.[6] (*Id.*) Plaintiff asserts that Nortriptyline is a psychotropic antidepressant and "is in no way a pain medication for Plaintiff's very real nerve pain." (Doc. 45 at 10 ¶ 13.) Plaintiff also states that Magnesium Oxide is an antacid for stomach aches. (*Id.*)

---

/druginfo/natural/945.html (last visited June 20, 2019).

[5] Alpha Lipoic Acid is an antioxidant that has been used to treat diabetic neuropathy. *See Alpha Lipoic Acid, University of Rochester Medical Center, Health Encyclopedia*, https://www.urmc.rochester.edu/encyclopedia/content.aspx?contenttypeid= 19&contentid=AlphalipoicAcid (last visited June 20, 2019).

[6] Nortriptyline is in a group of medications called tricyclic antidepressants, and it is used to treat depression. It is also sometimes used to treat panic disorders and neuralgia— the burning, stabbing pains or aches that may last for months or years after a shingles infection—and to help people stop smoking. *See Nortriptyline, U.S. Nat'l Library of Medicine*, https://medlineplus.gov/druginfo/meds/a682620.html (last visited June 20, 2019).

Magnesium oxide is used for different reasons including as an antacid to relieve heartburn, sour stomach, acid indigestion, or as a laxative. *See Magnesium Oxide*, *U.S. Nat'l Library of Medicine*, https://medlineplus.gov/druginfo/meds/a601074.html (last visited June 20, 2019).

At a March 24, 2017 chronic care appointment with Defendant, Plaintiff complained of chronic back pain and asked for Baclofen to be prescribed, which he said had been successful in treating his pain in the past. (Doc. 42 at 3 ¶ 15.) Defendant examined Plaintiff and instructed him to continue taking his medications as ordered. (*Id.*) At that time, Plaintiff was taking Aspirin, Magnesium Oxide, Nortriptyline, and Alpha Lipoic Acid for his pain. (*Id.*)

At a June 13, 2017 chronic care appointment with Defendant, Plaintiff did not report any neuropathy or back pain. (Doc. 42 at 34 ¶ 20.) Plaintiff disputes this assertion, stating that he "al[]ways complained of his ongoing neuropathy nerve pain [e]very time he saw [D]efendant[.]" (Doc. 45 at 10 ¶ 20.) After a full examination, Defendant discontinued Ibuprofen and prescribed Meloxicam instead for Plaintiff's low back pain and Defendant adjusted the Magnesium Oxide prescription for muscle spasms.[7] (Doc. 42 at 3-4 ¶ 20.) Defendant also discussed the need for Plaintiff to increase his activity level. (*Id.*) Plaintiff asserts that Meloxicam is a medication to relieve symptoms of rheumatoid arthritis, which he does not have. (Doc. 45 at 11 ¶ 20.)

Plaintiff states that on July 12, 2018, he was re-prescribed Gabapentin by Dr. Ende, but before that he suffered terrible bouts of diabetic neuropathy nerve pain for two years because of Defendant. (Doc. 45 at 42 ¶ 10.)

**V.     Discussion**

There is no dispute that Plaintiff's neuropathy and pain constitute serious medical needs. Accordingly, the Court's analysis focuses on whether Defendant's discontinuation of Gabapentin and response to Plaintiff's pain rise to the level of deliberate indifference.

Defendant argues there is no evidence that Plaintiff's pain was treated with deliberate indifference and that Defendant "appropriately responded to and treated

---

[7] Meloxicam is a nonsteroidal anti-inflammatory drug used to relieve pain and swelling caused by osteoarthritis and rheumatoid arthritis. *See U.S. Nat'l Library of Med., Meloxicam*, https://medlineplus.gov/druginfo/meds/ a601242.html (last visited June 20, 2019).

Plaintiff's neuropathy and sciatica during her multiple encounters with him."[8] (Doc. 41 at 7.) Defendant argues that Plaintiff's lab testing of his Gabapentin levels "strongly suggested he was not taking the medication as prescribed and may have been diverting it." (*Id*.) Defendant cites no evidence to support that Plaintiff was possibly diverting his Gabapentin, nor does Defendant state in her own Declaration that she suspected Plaintiff was diverting his medication.

The parties dispute whether Plaintiff received Gabapentin during the two days before the blood test. Defendant's own evidence presented with her Motion only shows that Plaintiff received one dose of Gabapentin on July 11, 2016 at 12:32 p.m.; it does not show that he received his second dose that day or any Gabapentin on July 12 or 13, 2016. (*See* Doc. 42 at 6-7.) The medical record indicates that Plaintiff's blood was drawn on July 13, 2016 at 10:27 a.m., approximately 46 hours after the July 11 dose, which indicates he may have missed 4 doses of Gabapentin before the blood draw. Even if the Court considered Defendant's new evidence submitted with her Reply, Defendant does not explain the inconsistency between the records—one showing that Plaintiff did not receive any Gabapentin on July 12 or 13, 2016 (Doc. 58 at 5-6) and the other showing he did receive Gabapentin twice daily on those same dates (*id*. at 9-10). Regardless, Plaintiff avers that he did not receive Gabapentin in the days prior to the blood draw, and the Court must take his facts as true for purposes of summary judgment. At a minimum, there is a question of material fact about when and whether Plaintiff received Gabapentin in the days before the blood draw.

Defendant argues that when she discontinued Plaintiff's Gabapentin he remained on Ibuprofen and Metformin to treat the pain associated with his neuropathy from Type 2 Diabetes and back pain, and when Plaintiff continued to complain of back pain, she prescribed Capsaicin cream, Alpha Lipoic Acid, and Nortiptyline to treat his pain. (Doc. 41 at 8.) Defendant contends that "[g]iven the fact that Plaintiff had admitted to her [that] Gabapentin did not improve his pain, in addition to the fact that lab results indicated

---

[8] The Court did not locate any mention of sciatica in the record.

1  possible diversion of the medication, she was reasonably not going to re-prescribe
2  Gabapentin simply because Plaintiff requested the medication." (*Id.*) But as already noted,
3  there is a question of fact whether Plaintiff even received his Gabapentin in the days prior
4  to the blood test. And there is no explanation of how Plaintiff could have diverted a
5  medication that was to be crushed into water and then watched as he swallowed it.
6  Defendant suggests, but does not present any evidence, that Plaintiff's Gabapentin was not
7  crushed into water and that no one watched him as he swallowed it. Plaintiff also asserts
8  that he never told Defendant that the Gabapentin was not really helping with the pain,
9  which the Court must accept as true.

10  Moreover, Plaintiff has presented evidence that he told Defendant on August 3,
11  2016 that he did not receive his Gabapentin in the days prior to the blood draw. (Doc. 45
12  at 40 ¶ 7.) Accepting this as true, Defendant was aware that the blood test results might
13  not be accurate and there is no evidence that she ever verified Plaintiff's statements by
14  checking the medication administration record which show that Plaintiff did not receive
15  any Gabapentin on July 12 or 13 and only one dose on July 11. Even though Defendant
16  proffers contradicting records in her Reply, the Court must consider the evidence in the
17  light most favorable to Plaintiff, in which case the records show he did not receive the
18  medication for two days before the blood test. The Court may infer that Defendant had
19  access to the medical records and knew of the medication administration history.

20  Based on this record, there is a question of fact whether Defendant's action in
21  discontinuing Plaintiff's long-term use of Gabapentin was medically unacceptable and
22  constituted deliberate indifference. *See Sullivant v. Spectrum Med. Servs.*, CV 11-00119-
23  M-JCL, 2013 WL 265992, at *7 (D. Mont. Jan. 23, 2013) (genuine issue of material fact
24  whether the defendants acted with deliberate indifference where the only explanation for
25  discontinuing the plaintiff's medications was that he was hoarding the medications;
26  "[d]enial of medical care as a form of punishment is acting in deliberate indifference of
27  medical needs if there is not some evidence that medical consequences were considered");
28  *Jacoby v. Cnty. of Oneida N.Y.*, 9:05-CV-1254 (FJS/GJD), 2009 WL 2971537, at *3-4, 12

(N.D. N.Y. Sept. 11, 2009) (the medical defendants' proffered reason for withholding the plaintiff's medications—that he was in possession of another inmate's medication—was not a solid basis for withholding medication, particularly given the defendants' knowledge of the plaintiff's mental health history); *cf. Macleod v. Onuoha*, 6:13-188-DCR, 2015 WL 632184, at *10-11 (E.D. Ky. Feb. 13, 2015) (discontinuing narcotic medication was warranted where the plaintiff had been found hoarding over 100 morphine pills in his rectum and he had been repeatedly charged with and convicted of improperly possessing drug substances); *Sepulveda v. Harris*, 9:09-cv-1117 (MAD/GHL), 2011 WL 2689357, at *5 (N.D. N.Y. July 11, 2011) (it was reasonable to discontinue narcotic pain medications after the plaintiff tested positive for illicit opiates because it was considered unsafe to mix the pain medications with illicit narcotics).

Although Defendant did not completely disregard Plaintiff's complaints of pain and prescribed various other medications, Plaintiff reported that those medications—Alpha Lipoic Acid, Capcaisin cream, and Nortriptyline—did not work. Other than these medications, Plaintiff received only Ibuprofen (and not always as prescribed) and Aspirin, but still reported ongoing pain.

There is a genuine issue of material fact as to whether Defendant was deliberately indifferent in discontinuing Plaintiff's Gabapentin based on the results of one blood test, and her subsequent response to Plaintiff's complaints of pain.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendant's Motion for Summary Judgment (Doc. 41) and Defendant's "Motion to Strike Sur-Reply and Supporting Documents (Docs. 50 and 51)" (Doc. 53).

(2) Defendant's "Motion to Strike Sur-Reply and Supporting Documents (Docs. 50 and 51)" (Doc. 53) is **denied**.

(3) Defendant's Motion for Summary Judgment (Doc. 41) is **denied**.

(4) This matter is referred to Magistrate Judge Eileen S. Willett for a settlement conference. Counsel for the parties and Plaintiff shall jointly call Judge Willett's chambers no later than **July 19, 2019** to schedule a settlement conference.

Dated this 8th day of July, 2019.

*David G. Campbell*
David G. Campbell
Senior United States District Judge